SHANNON LISS-RIORDAN (SBN 310719)
(sliss@llrlaw.com)
ANNE KRAMER, SBN 315131
(akramer@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:   (617) 994-5800
Facsimile:   (617) 994-5801

*Attorney for Plaintiff Thomas Liu,
on behalf of himself and all others
similarly situated*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS LIU, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant | Case No. 3:20-cv-07499<br><br>**HON. VINCE CHHABRIA**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E, ET. SEQ.<br><br>2. CAL. GOV'T CODE § 12940 ET. SEQ. |

1
SECOND AMENDED CLASS ACTION COMPLAINT

## I.     INTRODUCTION

1. This class action case is brought by Plaintiff Thomas Liu against Defendant Uber Technologies, Inc. ("Uber"), alleging that Uber has violated federal and state law by discriminating against minority drivers through use of its "star rating system," in which Uber passengers are asked to evaluate drivers on a one to five scale after each ride, and which is used by Uber to determine which drivers get terminated (or "deactivated", in Uber's language). Uber's use of this system to determine driver terminations constitutes race discrimination, as it is widely recognized that customer evaluations of workers are frequently racially biased. Indeed, Uber itself has recognized the racial bias of its own customers. Uber's use of this customer rating system to decide employment terminations constitutes disparate impact discrimination against non-white drivers.[1]

2. Plaintiff brings Count I of this action on behalf of himself and similarly situated Uber drivers across the country who have been subject to Uber's discriminatory use of its star rating system to terminate drivers. This claim is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

3. Plaintiff brings Count II of this action on behalf of himself and similarly situated Uber drivers in California who have been subject to Uber's discriminatory use of its star rating system to terminate drivers. This claim is brought under Cal. Gov't Code § 12940.

## II.     PARTIES

4. Plaintiff Thomas Liu resides in San Diego, California, and worked for Uber in California as a driver prior to his deactivation in October 2015.

---

[1] Plaintiff's claim that Uber's use of this customer rating system constitutes intentional disparate treatment discrimination as well was dismissed by the Court's Order of July 30, 2021 (Dkt. 41). Plaintiff has therefore omitted this claim in this Second Amended Complaint but does not, by doing so, waive this claim. The Court indicated in its order that the claim may be allowed to be added back in after discovery, id. at 4. Plaintiff also reserves the right to pursue this claim if necessary on appeal.

5. Defendant Uber Technologies, Inc. ("Uber") is a headquartered in San Francisco, California.

### III. JURISDICTION AND VENUE

6. This Court has general federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case arises under federal law, namely, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claim because the federal and state claims raised here derive from a common nucleus of operative facts.

8. The Northern District of California is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Uber Technologies, Inc. is headquartered in San Francisco, California. Furthermore, Uber engages in business activities in and throughout the State of California, including San Francisco.

### IV. STATEMENT OF FACTS

9. Uber is a San Francisco-based transportation service, which engages drivers across the country to transport riders.

10. Uber offers customers the ability to order rides via a mobile phone application, which its drivers then carry out.

11. In order to evaluate its drivers, Uber uses a passenger rating system, in which passengers are asked to rate their driver on a one to five scale after each ride. Uber calls this rating system its "star rating system."

12. In order to continue working for Uber, drivers must maintain a minimum average star rating. The minimum star rating is set by Uber management. The minimum star rating has frequently been set very high, even close to a perfect a score.

13. For instance, in order to be allowed to continue working for Uber, drivers in the San Diego area in 2015 were required to maintain a star rating of at least 4.6 on a scale of 1 to 5.

14. In October 2015, Plaintiff Thomas Liu was deactivated by Uber because his average star rating fell below 4.6.

15. Plaintiff Liu is Asian and from Hawaii and speaks with a slight accent. While driving for Uber, Plaintiff Liu noticed passengers appearing hostile to him, which appeared to him to be a result of racial discrimination. For example, he noticed riders cancelling ride requests after he had already accepted the ride and the rider was able to view his picture. He also experienced riders asking where he was from in an unfriendly way.

16. Plaintiff may seek to drive for Uber again in the future.

17. Plaintiff alleges that Uber's use of the passenger star rating system to determine terminations had a disparate impact on him, as well as other minority drivers across the United States.

18. Uber has long known that relying on a system that depends on passenger evaluation of drivers is discriminatory, as Uber is aware that passengers frequently discriminate against Uber drivers. Indeed, in the past, before it allowed tipping on the app, Uber tried to justify its refusal to add a method for passengers to tip drivers through the app based upon its assertion that passengers discriminate against racial minorities, and Uber professed concern that allowing tipping would therefore discriminate against minority drivers in the wages they would receive. *See* Dan Adams, *Uber's argument against tipping: Riders have a racial bias*, The Boston Globe (April 27, 2016) *available at* https://www.bostonglobe.com/business/2016/04/27/uber-resists-adding-tipping-its-app/BNEfLpo8dLcfC9czdcvtzI/story.html.[2]

---

[2] In support of its position, Uber relied upon a 2008 study by two Cornell University professors that found "that consumers of both races discriminate against black service providers by tipping them less…." Lynn, M., Sturman, M. C., Ganley, C., Adams, E., Douglas, M., &

4
SECOND AMENDED CLASS ACTION COMPLAINT

19. In response to Uber's position that tipping could lead to disparate pay based on race, drivers also raised concerns that, under the same reasoning, "customer bias could affect their ratings in Uber's zero-to-five-star ranking system, which the company uses to identify, retrain, and sometimes 'deactivate' poor drivers." Adams, *Uber's argument against tipping: Riders have a racial bias*, supra.

20. There have been other reports as well, over the years, highlighting concerns to Uber that its star rating systems is racially biased. *See* Joshua Brustein, *Uber Says Tips Are Bad for Black People. But What About Ratings Bias?,* Bloomberg, Apr. 28, 2016, https://www.bloomberg.com/news/articles/2016-04-28/uber-says-tips-are-bad-for-black-people-but-what-about-ratings-bias; *see also* Benjamin Hanrahan, Ning Ma & Chien Wen Tina Yuan, *The Roots of Bias on Uber*, College of Information Sciences and Technology at Pennsylvania State University, at Section 4.1.1 (reporting on driver comments regarding racial bias in the driver rating system).

21. Indeed, it is well recognized in social science research that employers' reliance on customer evaluation systems often leads to discriminatory impact on racial minorities. This research includes a paper that "analyzes the Uber platform as a case study to explore how bias may creep into evaluations of drivers through consumer-sourced rating systems." Rosenblat, A., Levy, K., Barocas, S., & Hwang, T. (2016), *Discriminating Tastes: Customer Ratings as Vehicles for Bias*, Intelligence and Autonomy, *available at*: https://datasociety.net/pubs/ia/Discriminating_Tastes_Customer_Ratings_as_Vehicles_for_Bias.pdf. In the paper, the authors find that:

---

McNeil J. (2008), *Consumer racial discrimination in tipping: A replication and extension*, Cornell University, School of Hospitality Administration site: http://scholarship.sha.cornell.edu/articles/27.

> Consumer-sourced ratings like those used by Uber are highly likely to be influenced by bias on the basis of factors like race or ethnicity. If a platform bases material employment determinations on such ratings, these systems—while appearing outwardly neutral—can operate as vehicles through which consumer bias can adversely impact protected groups … A plethora of social science research has established that racial and gender bias commonly "creeps into" ratings of all sorts.

*Id.* The paper was based on a review of the Uber rating system and numerous social science studies including: Ayres, I., M. Banaji, and C. Jolls. 2015. "Race effects on eBay." The RAND Journal of Economics 46, no. 4 (2015): 891- 917; Edelman, B., M. Luca, and D. Svirsky. 2016. "Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment." American Economic Journal: Applied Economics, Forthcoming. http://www.benedelman.org/publications/airbnb-guest-discrimination-2016-01-06.pdf; Doleac, J.L., and L.C.D. Stein. "The visible hand: Race and online market outcomes." The Economic Journal 123, no. 572 (2013): F469-F492; Edelman, B., M. Luca, and D. Svirsky. 2016. "Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment." American Economic Journal: Applied Economics, Forthcoming. http://www.benedelman.org/publications/airbnb-guest-discrimination-2016-01-06.pdf; Edelman, B. 2016. "Responses to Airbnb's Report on Discrimination." September 19, 2016. http://www.benedelman.org/news/091916-1.html; Elvira, M.M., and R. Town. 2001. "The Effects of Race and Worker Productivity on Performance Evaluations." Industrial Relations 40 (4): 571–90; Kraiger, K., and J.K. Ford. "A meta-analysis of ratee race effects in performance ratings." Journal of applied psychology 70.1 (1985): 56; Mobley, W.H. 1982. "Supervisor and Employee Race Effects on Performance Appraisals: A Field Study of Adverse Impact and Generalizability." Academy of Management Journal 25 (3): 598–606; Rogers, B. 2015. "The Social Costs of Uber." The University of Chicago Law Review Dialogue 82:85.

https://lawreview.uchicago.edu/sites/lawreview.uchicago.edu/files/uploads/Dialogue/Rogers_Dialogue.pdf; Shohat, M., and J. Musch. 2003. "Online auctions as a research tool: A field experiment on ethnic discrimination." Swiss Journal of Psychology/Schweizerische Zeitschrift für Psychologie/Revue Suisse de Psychologie 62, (2): 139; Wang D., S. Xi, and J. Gilheany. 2015. "The Model Minority? Not on Airbnb.com: A Hedonic Pricing Model to Quantify Racial Bias against Asian Americans." Technology Science. September 1. http://techscience.org/a/2015090104/.

22.     At least one news outlet covered the 2016 study and noted that Uber did not respond to a request for comment. *See* Aviva Rutkin, Do Uber Ratings Let Passengers Discriminate Against Drivers?, NewScientist, Oct. 12, 2016, https://www.newscientist.com/article/mg23230953-000-do-uber-ratings-let-passengers-discriminate-against-drivers/.

23.     In light of research in this area, as well as Uber's self-professed statement that it would not allow tipping for drivers because of its concerns regarding customer bias, Uber's use of its star rating system to determine driver terminations is racially discriminatory, as it has a disparate impact on minority drivers.

24.     Indeed, Plaintiff's counsel conducted a survey of Uber drivers that confirmed that Uber's policy of terminating drivers based on not meeting a minimum star rating has had an adverse impact on minority drivers.[3]

25.     In November 2021, Plaintiff's counsel sent a survey by electronic mail to approximately 20,000 Uber drivers (who are clients of Plaintiff's counsel). The survey asked the

---

[3] In its Order of July 30, 2021 (Dkt. 41), at 3, the Court indicated that Plaintiff "must make a more sophisticated effort at the front end to develop a plausible factual basis in support of his assertion that terminations at Uber occur on a racially disparate basis." As shown here through these amended allegations, Plaintiff's counsel has now done this "legwork", which overwhelmingly supports Plaintiff's allegation that Uber's policy has a disparate impact on minority drivers.

7
SECOND AMENDED CLASS ACTION COMPLAINT

drivers whether they had been deactivated by Uber based upon their star ratings, and it asked them to identify their race.

26. In response to the survey, 4,093 Uber drivers responded with answers to these questions. The results are shown here:

| | If you have been deactivated by Uber, was it because your star ratings were too low? | | | |
|---|---|---|---|---|
| What is your race? | Yes | No | % Yes | Statistical significance in disparity with whites? |
| White | 275 | 1310 | .174 | -- |
| Asian | 125 | 384 | .246 | .0002 |
| Black | 201 | 633 | .241 | <.0001 |
| Latinx | 117 | 574 | .169 | no |
| Other | 118 | 356 | .249 | .0003 |

27. As shown above, 17.4% of white respondents indicated that they had been deactivated by Uber based on star ratings. In contrast, 24.6% of Asian respondents, 24.1% of Black respondents, and 24.9% of respondents who identified their race as "Other" than the choices provided indicated that they had been deactivated by Uber based on star ratings. Only 16.9% of Latinx respondents indicated that they had been deactivated by Uber based on star ratings.[4]

[4] A large number of respondents who checked "Other" on the race question self-identified themselves as "Hispanic", "Latino", "Mexican American", or other identities that may be considered "Latinx". However, their responses were tabulated under "Other", rather than "Latinx", because they checked "Other" in response to the survey.

28.     Plaintiff's counsel consulted with Dr. Mark Killingsworth, a professor in the Department of Economics at Rutgers University.[5] Dr. Killingsworth examined the survey responses and found the results to be highly statistically significant that race is associated with Uber drivers in the survey reporting that they had been deactivated based on their star ratings.

29.     According to Dr. Killingsworth, overall the chance that the survey results, shown above, would have resulted, had race played no role in drivers being deactivated based on their star ratings, is less than 1 in 10,000 (<.0001 probability).  This result is highly statistically significant.[6]

30.     According to Dr. Killingsworth, as shown in the table above, with respect to the comparison of results of particular races to white respondents, the chance of race having played no role in drivers being deactivated based on their star ratings is 2 in 10,000 (.0002 probability) for Asian respondents, less than 1 in 10,000 (<.0001 probability) for Black respondents, and 3 in 10,000 (.0003 probability) for respondents who identified their race as "Other" than one of the given categories.  For drivers who identified themselves as "Latinx", there was no statistically

---

[5]     A federal court has described Dr. Killingsworth's qualifications as follows:

> Dr. Killingsworth is a labor economist with more than 40 years of experience and has a substantial record as an expert witness in federal and state litigation. He is the author of *Labor Supply* and *The Economics of Comparable Worth*, and has also authored numerous publications in the areas of comparable worth, pay equity, employment discrimination, and wage differentials. Also, Dr. Killingsworth has testified in front of United States Congressional Committees and the General Assembly of Pennsylvania. In addition, he has been a consultant to United States District Judge Robert L. Carter, the Canadian Department of Justice, and the United States Departments of Justice and Labor. Dr. Killingsworth graduated from the University of Michigan and received M.Phil. and D.Phil. degrees from the University of Oxford, where he was a Rhodes Scholar.

Artunduaga v. Uni. Of Chicago Med. Ctr., 2016 WL 7384432, at *2-3 (N.D. Ill. Dec. 21, 2016) (citing cases).

[6]     Probabilities of less than .05 are generally considered statistically significant.  A probability of less than .0001 is thus highly statistically significant.

significant disparity between them and white drivers with respect to whether they reported having been deactivated by Uber based on star ratings (indeed, a smaller proportion of "Latinx" drivers indicated they had been deactivated based on ratings than white drivers) (but see note 4 supra).

31. While these survey results were pulled from just a relatively small sampling of Uber drivers, who Plaintiff's counsel was able to survey without cooperation from Uber, or access to data or other information in Uber's possession, and are entirely self-reported, the striking statistical significance of the results provides a "plausible factual basis in support of [Plaintiff's] assertion that terminations at Uber [due to its star rating policy] occur on a racially disparate basis." Order of July 30, 2021 (Dkt. 41), at 3.

32. Although Uber drivers are classified as independent contractors, they are actually employees under Title VII, as well as under California state discrimination law (at least up until the passage of Proposition 22), for the purposes of the claims alleged herein.

33. Drivers perform a service in the usual course of Uber's business, since Uber is a car service that provides transportation to its customers, and drivers such as Plaintiff Liu have performed that transportation service. Uber holds itself out as a transportation service, for example, by billing itself as "[a] company that moves people", and whose core mission is to "get[] you from point A to point B".[7] Uber generates its revenue primarily from customers paying for the very rides that its drivers perform. Without drivers to provide rides for Uber's customers, Uber would not exist. Indeed, Uber's prospectus for its 2019 IPO describes how its drivers are the lifeline of its business: "If we are unable to attract or maintain a critical mass of

---

[7] In responding to COVID-19, Uber advertised that "A company that moves people is asking you not to move." See @Uber, Instagram, March 31, 2020, https://www.instagram.com/p/B-Z8d5ppbi7/?hl=en. Uber's CEO has held the company out as having the mission of moving people from point A to point B. See Dara Kerr, *Uber Wants to be the "Amazon of Transportation,"* Cnet, Sept. 16, 2018, https://www.cnet.com/news/uber-wants-to-be-the-amazon-of-transportation/.

Drivers … our platform will become less appealing to platform users, *and our financial results would be adversely impacted* … Any decline in the number of Drivers … using our platform *would reduce the value of our network and would harm our further operating results*." Uber SEC S-1, pp. 29-30 [Filing Date: March 1, 2019] (emphasis added).

34. Uber also requires its drivers to abide by a litany of policies and rules designed to control the drivers' work performance, which it closely monitors. Examples of this control include, but are not limited, to the following:

   a. Uber screens its drivers and requires that drivers meet certain requirements prior to being approved to drive for Uber. For example, Uber requires that its drivers undergo a background check. Uber has also required that drivers upload photos of their licenses and proof of personal insurance. At times, Uber has required drivers to attend in-person training classes and pass a written test as a prerequisite to driving for Uber. At other times, Uber has required drivers to undergo retraining, after they have been terminated, in order to work again as a driver;

   b. Drivers' vehicles must meet Uber's quality standards, which it determines and may change at any time at its sole discretion. For example, Uber has set age restrictions on the vehicles drivers may use;

   c. Uber has monitored its drivers' work hours and logs a driver off its app for six hours if the driver reaches a twelve-hour driving limit. Uber has also sent messages to drivers to encourage them to go on-duty during high-demand hours;

   d. Uber has used its app to constantly monitor and control its drivers' behavior while its drivers are logged into the app. Indeed, Uber tracks its drivers, and the drivers must notify Uber through the Uber app of the drivers' trip status at every key step of the on-demand ride: (1) acceptance of the rider's ride request, (2) arrival to the pick-up location of the rider, (3) start of the trip, and (4) end of the trip;

    e. Uber has retained the right to suspend or terminate drivers who do not accept enough rides, cancel too many rides, do not take what Uber deems to be the most efficient routes, or engage in other conduct that Uber, in its sole discretion, may determine constitutes grounds for suspension or termination. Uber has retained discretion to terminate a driver if the driver behaves in a way that Uber believes is inappropriate or has violated one of Uber's rules or standards.  As set forth here, drivers have been subject to termination based on Uber's system of using customer rating feedback; drivers can be terminated if their average star rating falls below a minimum threshold set by Uber;

    f. Uber mediates drivers' interactions with passengers.  Uber takes complaints from customers regarding drivers and works with drivers to address the issues raised. Uber has also retained sole discretion to resolve driver requests for cleaning reimbursements, meaning that a driver is barred from directly requesting reimbursement from a passenger who has, for example, vomited in their vehicle;

    g. At various points in time, Uber has instructed drivers via email and online training videos on how to maintain their vehicles for cleanliness and presentation, how to pick up passengers, how to behave while driving, and how to raise their star rating.  While these best practices have been couched as suggestions, since Uber has retained the right to terminate drivers in its sole discretion, failure to comply may and has resulted in drivers' termination.

35. When driving for Uber, drivers are not engaged in their own transportation business. Instead, when driving Uber customers, drivers wear the "hat" of Uber.  Specifically:

    a. Using the Uber app, passengers cannot request a particular driver.  When they request a ride, they are made to understand that they are using Uber to obtain the ride;

    b. Passengers pay Uber for the ride and cannot pay the driver directly;

    c. The passengers are Uber's customers, not customers of the individual driver;

    d. Uber is and has been deeply involved in marketing its transportation services, qualifying and selecting the drivers, regulating and monitoring their performance, and fare setting. Uber has trademarked the slogan, "Everyone's Private Driver." Uber also advertises: "We built Uber to deliver rides at the touch of a button"; "Always the ride you want"; "Request a ride, hop in, and go": "Sign up to ride. Rides on demand"; and "Get a reliable ride in minutes, at any time and on any day of the year.";

    e. Uber has branded the rides that its drivers provide to Uber passengers as Uber rides. For example, Uber has required drivers to display Uber trade dress while performing transportation services for Uber, such as requiring drivers to display an Uber "U" decal on windshields when providing rides to Uber passengers.

36. Uber does not require drivers to possess any skill above and beyond that necessary to obtain an ordinary driver's license.

37. Uber provides the drivers with the primary instrumentality with which they can perform services for Uber because it provides the Uber app, and Uber only derives a benefit from the drivers' labor when they use Uber's software. In contrast, drivers do not invest in any equipment or materials required for their services; rather, all drivers must already own or have the legal right to operate a vehicle in good operating condition before they can work as an Uber driver.

38. Uber unilaterally determines drivers' compensation and method of payment:

    a. Uber sets the method by which drivers' pay is calculated, as it calculates drivers' fares according to a formula that it has set in its sole discretion;

b. Uber then collects the fare from the passenger and disburses a portion of those fares to the driver as compensation for providing the on-demand ride the passenger ordered, while retaining the remainder of the fare for itself;

c. Uber handles all invoicing, claim and fare reconciliation, and resolution of complaints that arise from drivers and passengers;

d. Uber has also at times actively sought drivers with advertisements promising a set hourly rate.

39. Drivers' tenures with Uber have been for an indefinite period of time, although Uber has retained the right to terminate drivers in its sole discretion.

40. Uber drivers are engaged in interstate commerce. At times, drivers transport passengers across state lines. Furthermore, drivers are engaged in interstate commerce insofar as they transport passengers who are within the flow of interstate commerce; indeed, drivers often drive passengers to or from airports, train stations, and bus stations, as part of their interstate journeys. Uber has partnered with various airlines to allow passengers to begin or end their interstate journeys with an Uber ride, by offering them various promotional deals to book a ride with Uber to take them to or from the airport.

## V. TITLE VII CLASS ALLEGATIONS

41. Plaintiff brings this case as a class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, on behalf of all non-white Uber drivers across the country who have been terminated (or put at risk of termination) based upon Uber's star rating system.

42. This class meets the prerequisites of Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2) and 23(b)(3) specifically, in that:

a. The class is so numerous that joining all members is impracticable. The exact number of the members of the class is unknown, but numerous (likely thousands) of non-white Uber drivers across the

      country have been terminated (or put at risk of termination) based on Uber's use of the star rating system. As a result, joinder of all these individuals is impracticable.

b. There are questions of fact and law common to all of these potential class members, because all of these individuals have been terminated (or put at risk of termination) based upon Uber's use of its star rating system to set a minimum standard to continue driving for Uber.

c. The claims of the named plaintiff is typical of the claims of the drivers across the country who have been subject to Uber's use of the star rating system to terminate drivers.

d. Plaintiff and his counsel will fairly and adequately represent the interests of the class. The named plaintiff has no interests adverse to or in conflict with the class members whom he proposes to represent. Plaintiff's counsel are well qualified to litigate this case, as they have been recognized as leading counsel nationally for representing the rights of employees in class action and other employment litigation across the nation.

e. The questions of law or fact common to all members of each class predominate over any questions affecting only individual members. The common questions include, among other things, whether Uber's use of its star rating system is racially discriminatory.

f. Litigating these claims as a class action is superior to other available methods for the fair and efficient adjudication of these claims. Among other things, individual adjudications would result in highly inefficient duplication of discovery, legal briefing, court

proceedings, and the risk of inconsistent legal rulings. Further, the alternative to a class action may be no redress for many Uber drivers across the country who would not litigate these claims individually.

## VI. CALIFORNIA CLASS ALLEGATIONS

43. Plaintiff brings this case as a class action on behalf of all non-white Uber drivers who have driven for Uber in California and who have been terminated (or put at risk for termination) based upon Uber's star rating system.

44. This class meets prerequisites of Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(2) and 23(b)(3) specifically, in that:

   a. The class is so numerous that joining all members is impracticable. The exact number of the members of the class is unknown, but numerous (likely thousands) of non-white Uber drivers in California have been terminated (or put at risk of termination) based on Uber's use of the star rating system. As a result, joinder of all these individuals is impracticable.

   b. There are questions of fact and law common to all of these potential class members, because all of these individuals have been terminated based upon Uber's use of its star rating system.

   c. The claims of the named plaintiff are typical of the claims of the drivers in California who have been subject to Uber's use of the star rating system to terminate drivers.

   d. Plaintiff and his counsel will fairly and adequately represent the interests of the class. The named plaintiff has no interests adverse to or in conflict with the class members whom he proposes to represent. Plaintiff's counsel are well qualified to litigate this case, as they have

    been recognized as leading counsel nationally for representing the rights of employees in class action and other employment litigation across the nation.

  e. The questions of law or fact common to all members of each class predominate over any questions affecting only individual members. The common questions include, among other things, whether Uber's use of its star rating system is racially discriminatory. Litigating these claims as a class action is superior to other available methods for the fair and efficient adjudication of these claims. Among other things, individual adjudications would result in highly inefficient duplication of discovery, legal briefing, court proceedings, and the risk of inconsistent legal rulings.  Further, the alternative to a class action may be no redress for many Uber drivers in California who would not litigate these claims individually.

## VII. **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

  45. Plaintiff Thomas Liu timely filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") prior to filing this complaint.  The EEOC issued a Dismissal and Notice of Rights on or about August 7, 2020.  This lawsuit was filed within 90 days of receipt of the Dismissal and Notice of Rights letter.

  46. Plaintiff likewise exhausted his state law administrative remedies with the pertinent state agency.  When filing his Charge of Discrimination with the EEOC, Plaintiff indicated that the charge should be cross-filed with the California Department of Fair Employment & Housing.  The EEOC indicated to Plaintiff in a letter dated September 28, 2016, that it was sending a copy of the charge to that Department, which would investigate the complaint under California law.

# COUNT I

## RACE DISCRIMINATION UNDER TITLE VII

Plaintiff re-alleges and incorporates the above paragraphs by reference as if fully set forth herein. Uber's use of its star rating system to terminate drivers constitutes unlawful discrimination based on race, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, because it has a disparate impact on non-white drivers.

# COUNT II

## RACE DISCRIMINATION UNDER CALIFORNIA LAW

Plaintiff re-alleges and incorporates the above paragraphs by reference as if fully set forth herein. Uber's use of its star rating system to terminate drivers constitutes unlawful discrimination based on race, pursuant to Cal. Gov't Code § 12940, because it has a disparate impact on non-white drivers.

WHEREFORE, Plaintiff requests that this Court enter the following relief:

a. Find and declare that Uber's use of the star rating system constitutes discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and Cal. Gov't Code § 12940;

b. Enter an injunction (which includes public injunctive relief) enjoining Uber from continued use of its star rating system to determine driver terminations;

c. Certify this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3), for both a national class (under Title VII) and a California class (under California law), and appoint Plaintiff as class representative and his counsel as class counsel;

d. Award compensatory damages, including back pay, for class members who have been terminated due to Uber's unlawful use of the star rating system;

e. Award any other damages that may be appropriate, including for emotional distress, punitive damages, and nominal damages, for drivers who have been terminated (or put at risk of termination) based upon Uber's discriminatory use of its star rating system;

f. Award all costs and attorneys' fees incurred prosecuting this action;

g. Award interest;

h. Award any other relief to which Plaintiff and class members may be entitled.

Respectfully submitted,

THOMAS LIU, on behalf of himself and all others similarly situated,

By his attorney,

　__/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, SBN 310719
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com

Dated:         November 26, 2021

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on November 26, 2021, she filed and served the foregoing document via the Court's CM/ECF system, which will send notice of the filing to all counsel of record. Parties may access the filing through the Court's CM/ECF system.

　_/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan

19
SECOND AMENDED CLASS ACTION COMPLAINT